IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JACQUELINE HAMPSHIRE, et al.　　：　　　CIVIL ACTION
　　　　　　　　　　　　　　　　　：
　　　　　v.　　　　　　　　　　　：
　　　　　　　　　　　　　　　　　：
PHILADELPHIA HOUSING　　　　　　 ：
ADMINISTRATION, et al.　　　　　 ：　　　NO. 17-4423

MEMORANDUM

Bartle, J.                                    February 14, 2019

          Plaintiffs Jacqueline Hampshire and Christian
Jablonski bring this action against defendants the Philadelphia
Housing Authority ("PHA"), Branville Bard, and Joanne Strauss
alleging discrimination in violation of 42 U.S.C. §§ 1981 and
1983, Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§§ 2000e et seq., and the Pennsylvania Human Relations Act, 43
Pa. Stat. §§ 951 et seq.  Plaintiffs, who are Caucasian, assert
that they were subjected to a hostile work environment and
terminated from their employment with PHA due to their race.
Plaintiff Hampshire also asserts that she was subjected to a
hostile work environment and terminated on the basis of gender.
Plaintiffs further claim violations of their rights to free
association and due process under the First and Fourteenth
Amendments to the United States Constitution.  Before the court
is the motion of defendants for summary judgment under Rule 56
of the Federal Rules of Civil Procedure.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). We view the facts and draw all inferences in favor of the nonmoving party. See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).

Summary judgment is granted where there is insufficient record evidence for a reasonable factfinder to find for the nonmovant. See Anderson, 477 U.S. at 252. "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." Id. In addition, Rule 56(e)(2) provides "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2).

II

The following facts are undisputed.  PHA is the
nation's fourth largest public housing authority, owning more
than 14,000 housing units and serving nearly 80,000
Philadelphians.  It maintains its own police department.
Hampshire was hired by PHA as a police officer on April 15,
2013.  Jablonski was hired by PHA as a patrol officer on
February 27, 2015.  Bard was hired by PHA as its Chief of Police
on February 20, 2015.  Strauss was hired by PHA in 2010 and was
Vice President of Human Resources for PHA.

During the relevant time frame, PHA had in effect PHA
Police Department ("PHAPD") Directive O-11, "Safe Operation of
Police Vehicles," which provides in pertinent part:

1.  PHAPD officers will only engage in
    vehicle pursuits when they have probable
    cause to believe that the occupant/s of
    the vehicle being pursued has committed,
    has attempted to commit, or is attempting
    to commit a forcible felony.

2.  PHAPD officers should <u>not</u> engage in
    vehicle pursuits for traffic violations
    or hit and run or leaving the scene [of]
    accidents unless the accident is a fatal
    or potentially fatal incident.

3.  PHAPD officers should not pursue stolen
    autos.

4.  PHAPD officers should <u>not</u> pursue any
    vehicle the wrong way on the roadway
    (i.e. one way street, divided highway,
    expressway, interstate highway and/or
    etc.) under any conditions.

The Directive further provides:

> 1. When a police officer initiates a pursuit, the officer will immediately notify police radio of the following:
>
>     a. Location, direction traveling and speed, give location as often as possible.
>     b. Reason for pursuit, law violated.
>     c. Description of vehicle and occupants.
>
>     The officer not driving must keep radio informed throughout the pursuit.
>
> . . . .
>
> 6. Officers involved in a vehicle pursuit will complete a pursuit memorandum and forward it via the chain of command to the commander of patrol within five (5) days of the pursuit.

Pennsylvania law requires that police departments including PHAPD maintain such policies.  <u>See</u> 75 Pa. Cons. Stat. Ann. §§ 6342.[1]  Plaintiffs admit that they were provided a copy of Directive O-11 at the time of their hire.

_____

1.  Pennsylvania statute defines "[m]otor vehicle pursuit" as "[a]n active attempt by a police officer operating a motor vehicle to apprehend one or more occupants of a motor vehicle when the driver of the vehicle is resisting the apprehension by maintaining or increasing his speed or by ignoring the police officer's audible or visual signal to stop."  75 Pa. Cons. Stat. Ann. § 6341.  It further provides that "[e]ach police department shall develop and implement a written emergency vehicle response policy governing the procedures under which a police officer should initiate, continue and terminate a motor vehicle pursuit" and sets out guidelines for such pursuit policies.  <u>Id.</u> § 6342.

In addition, PHAPD Chief Bard had implemented Chief's Order B-15-0011, "Limits of Authority," effective September 16, 2015. That Order provided:

Jurisdiction

I.  Per 35 P.S. section 1550(10)(ff), PHA PD officers have primary jurisdiction to effectuate an arrest in the following situations:

    a. Any crime that occurs in and upon the grounds and buildings of the Philadelphia Housing Authority.

    b. Any crimes that initiate in and upon the grounds and buildings of the Philadelphia Housing Authority but continue outside of the grounds and buildings (hot pursuit).

II. PHA PD officers do not have jurisdiction off of the property except as indicated in I. They are thereby directed to limit their police activity to the area within the limited jurisdiction.

This policy was read at roll call for three consecutive days when first implemented, and it was also posted on a wall at PHA headquarters. Plaintiffs both signed an acknowledgment of having received the policy on September 17, 2015.

PHA also maintains a Disciplinary Code that regulates the conduct of PHAPD officers and other employees. Article I of the Disciplinary Code identifies various conduct that is unbecoming of a PHAPD employee, including the "[f]ailure to cooperate in any Departmental investigation." Article V

delineates conduct that constitutes neglect of duty, including "[f]ailure to properly patrol area of responsibility," "[f]ailure to make required written report," "[f]ailure to conduct a proper, thorough and complete investigation," and "[f]ailure to comply with any Chief of Police's orders, directive, memorand[a], or regulation; or any oral or written orders of superiors." The Disciplinary Code also describes conduct that constitutes motor vehicle violations including the "[f]ailure to follow Departmental procedures involving pursuit and/or emergency driving." Under the Code, the PHA Chief of Police and Human Resources are permitted to impose discipline up to and including termination for violations of the Code.

On March 9, 2016, plaintiffs were working together as partners on the 7:00 p.m. to 7:00 a.m. shift and were assigned to use PHAPD patrol vehicle number 9620. Jablonski was the driver and Hampshire rode as the "recorder" responsible for completing necessary paperwork. At approximately 1:15 a.m., plaintiffs were sitting in their patrol car in a parking lot between 11th and 12th Streets on Cecil B. Moore Avenue in Philadelphia filling out paperwork. Plaintiffs concede that this location is outside PHAPD's jurisdiction.

A message came across the PHAPD radio that a Philadelphia Police Department ("PPD") officer had attempted to stop a speeding vehicle. There was no indication that the

-6-

driver of the vehicle had committed a forcible felony or had
been involved in a fatal or potentially fatal incident.  After
the vehicle passed them, Jablonski turned out of the parking lot
and activated his emergency lights and sirens.  Plaintiffs then
pursued the vehicle at a high rate of speed for approximately
eleven city blocks, from 11th Street to North 3rd Street.  The
speeding vehicle never stopped but instead maintained or
accelerated its speed.  According to the GPS data, plaintiffs'
patrol car reached speeds of up to 85 miles per hour through
city streets as plaintiffs engaged in the pursuit.

        After crossing North American Street, heading east on
Cecil B. Moore Avenue, the driver of the speeding vehicle lost
control and crashed at the corner of 2nd Street and Cecil B.
Moore Avenue.  The car knocked over a number of light posts on
Cecile B. Moore Avenue and slammed into the side of a building.
The car burst into flames, and the driver was killed.  There is
no evidence that plaintiffs saw or heard the crash and
subsequent fiery explosion.  Instead, plaintiffs turned off on
American Street, a block away from the crash, after losing sight
of the speeding vehicle.

        Plaintiffs never radioed to advise that they were
involved in a pursuit and did not record the incident on their
patrol log.  Plaintiffs then went to Fairhill Apartments to
conduct a building check.  Although plaintiffs stated in their

patrol log that they were at Fairhill Apartments for nine minutes, surveillance showed that plaintiffs were there for only three minutes.

Plaintiffs subsequently traveled to another PHA property, at 1900 Judson Street. There, plaintiffs saw Sergeant Abdul Evans, their supervisor, who signed their patrol log. Plaintiffs told Evans they had attempted to stop a vehicle but did not provide further details. According to Evans, if plaintiffs did not actually stop a vehicle, they need not record the incident on the patrol log.

Shortly thereafter, plaintiffs were instructed to meet PPD officers at 2nd Street and Cecil B. Moore Avenue. Jablonski spoke with a PPD supervisor about the incident; Hampshire refused. Thereafter, plaintiffs were asked by the PPD supervisor to go to PPD headquarters to be interviewed by the Department's Accident Investigation Department ("AID"). Plaintiffs reported directly to PPD AID and provided statements.

On March 10, 2016, PHA Chief Bard and PHA Vice President of Human Resources Strauss made the decision to suspend plaintiffs for ten days with recommendation for discharge. Plaintiffs were individually called into a meeting that day with Bard, Strauss, PHA Chief Inspector Joseph Marker, and their union representative, at which time the notice of suspension was read to them and they were asked if they had any

questions.  Plaintiffs remained silent.  The notices of
suspension stated that plaintiffs were being suspended for the
following reasons:  (1) violation of PHAPD Directive 4.2–failure
to comply with the Chief's orders; (2) violation of PHAPD
Directive O-11–safe operation of vehicles; and (3) violation of
PHAPD Directive 1.2–making a false statement in an
investigation.

Four days later, on March 14, 2016, plaintiffs
received Revocations of Suspension, which stated they were being
placed on administrative duty in lieu of suspension.  Bard
explained that he made this change after he learned that the PHA
internal investigation into plaintiffs' pursuit would take
longer than ten days.  The notice restricted plaintiffs to desk
duty with pay "pending the results of an investigation
concerning your involvement in a fatal high-speed vehicle
pursuit that occurred the morning of March 9, 2016."  The
plaintiffs worked in the communications room while on desk duty.

In the meantime, Bard requested that the PHA Office of
Audit and Compliance ("OAC") conduct a full investigation of the
incident.  PHA Investigators Joseph Melso and Joseph Serrano
conducted the investigation.  Melso and Serrano interviewed
Evans, plaintiffs' supervisor, and Helena Toombs, a PHA officer
who was working in the operations room at the time of the
incident.  They interviewed the PPD officer who initially

attempted to stop the speeding vehicle and the PPD officer who
first responded to the crash and was conducting the PPD AID's
investigation of the incident. The investigators also spoke to
a Temple University Police Department officer who witnessed the
pursuit and crash. Plaintiffs each appeared for interviews with
the OAC on March 18, 2016, but they refused, based on advice of
counsel, to answer questions. OAC reviewed the GPS data of all
PHA patrol cars for the night at issue, the PPD investigation
memo, witness statements collected by the PPD, and plaintiffs'
statements to the PPD AID.

On April 12, 2016, OAC completed its report. OAC
concluded based on the evidence reviewed that plaintiffs had
violated numerous PHA policies, including failure to patrol
their area of responsibility, failure to comply with the Chief's
orders, and failure to follow PHA policies regarding vehicle
pursuits. As a result of the investigation and plaintiffs'
violations of policies, Bard, in conjunction with Strauss, made
the determination to suspend plaintiffs for ten days with a
recommendation for discharge.

On June 6, 2016, plaintiffs were again called
individually to a meeting with Bard, Strauss, and plaintiffs'
union representative to discuss the OAC investigation and their
suspensions with recommendation for discharge. Plaintiffs were
allowed to ask questions but did not do so. During the

meetings, plaintiffs each received another notice of suspension without pay for ten days with the recommendation for discharge based on the following violations of PHA policy:  (1) violation of PHAPD Directive—Article V, Neglect of Duty section 5-§011-10, failure to comply with any of Chief's orders, directives, memoranda, or regulations, or any oral or written orders of superiors; (2) violation of PHAPD Directive—Article V, Neglect of Duty section 5-§005-10, failure to make a required written report; (3) violation of PHAPD Directive—Article V, Neglect of Duty section 5-§003-10, failure to properly patrol area of responsibility; (4) violation of PHAPD Directive—Article VII, Motor Vehicle Violations section 7-§004-10, failure to follow departmental procedures involving pursuit and/or emergency driving; and (5) violation of PHAPD Directive O-11—safe operation of police vehicles.

The next day, June 7, 2016, plaintiffs' union filed a grievance with regard to the suspensions with recommendation for discharge.  A grievance hearing was held on July 7, 2016, but plaintiffs, who had not yet been terminated, did not attend.  However, multiple union representatives were there, including the union's president, vice president, and secretary/treasurer.

Strauss acted as grievance officer.  She issued a determination
on October 13, 2016 upholding the terminations.[2]

Plaintiffs were terminated that day.  They received
termination letters citing the following offenses:
(1) violation of PHAPD Directive—Article V, Neglect of Duty
section 5-§011-10, failure to comply with any of Chief's orders,
directives, memoranda, or regulations, or any oral or written
orders of superiors; (2) violation of PHAPD Directive—Article V,
Neglect of Duty section 5-§003-10, failure to properly patrol
area of responsibility; (3) violation of PHAPD Directive—Article
VII, Motor Vehicle Violations section 7-§004-10, failure to
follow departmental procedures involving pursuit and/or
emergency driving; and (4) violation of PHAPD Directive
O-11-safe operation of police vehicles.

Thereafter, the union filed a request for arbitration.
Following the arbitration hearing held on March 9, 2017, the
arbitrator upheld plaintiffs' terminations for just cause under
the collective bargaining agreement.  Both plaintiffs were
present and testified at the hearing.

On October 4, 2017, plaintiffs filed a complaint in
this court alleging the following claims:  (1) race and gender
discrimination and hostile work environment in violation of

---

2.  Although she upheld the terminations, Strauss sustained the
grievance as to plaintiffs' alleged failure to make a written
report, as she found that such report was later provided.

-12-

Title VII against Bard, Strauss, and PHA (Count I); (2) race and gender discrimination and hostile work environment in violation of Title VII against PHA under a <u>Monell</u> theory of liability (Count II)[3]; (3) deprivation of equal protection and procedural due process rights under 42 U.S.C. §§ 1981 and 1983 (Count III); (4) retaliation and deprivation of their rights to association under the First and Fourteenth Amendment to the United States Constitution, in violation of § 1983 (Count IV); and (5) discrimination on the basis of race and gender and hostile work environment in violation of the PHRA (Count VI).[4]

### III

We begin with plaintiff Jacqueline Hampshire's claim for gender discrimination under Title VII and the PHRA in Counts I, II and VI of the complaint.[5]  Specifically, Hampshire asserts

---

3.  Under <u>Monell v. Department of Social Services of City of New York</u>, 436 U.S. 658, 690-95 (1978), a municipal agency such as PHA may be held liable for an employee's violation of a citizen's constitutional rights if the violation was caused by an official policy, regulation, decision, or practice or custom, of the municipality.  As a result of our decision here, we do not have to undertake a <u>Monell</u> analysis as to any of plaintiffs' claims.

4.  Count V of the complaint appears to have been unintentionally omitted.

5.  The claims of plaintiffs under Title VII against Bard and Strauss individually were previously dismissed because Title VII does not create individual employee liability.  <u>See</u> <u>Sheridan v. E.I. DuPont de Nemours & Co.</u>, 100 F.3d 1061, 1077-1078 (3d Cir. 1996).

that she was suspended and terminated by PHA due to her gender.

Title VII provides in relevant part:

> It shall be an unlawful employment practice
> for an employer . . . to fail or refuse to
> hire or to discharge any individual, or
> otherwise to discriminate against any
> individual with respect to his compensation,
> terms, conditions, or privileges of
> employment, because of such individual's
> race, color, religion, sex, or national
> origin.

42 U.S.C. § 2000e-2(a)(1).

To defeat defendants' motion for summary judgment on

her claim for gender discrimination under Title VII and its

analogous provision under the PHRA, Hampshire must first come

forward with evidence of a prima facie case of gender

discrimination as follows:  (1) she was a member of a protected

class; (2) she was qualified for the position of patrol officer;

(3) she suffered an adverse employment action; and (4) the

action occurred under circumstances that could give rise to an

inference of intentional discrimination. [6]  See Jones v. Se. Pa.

Transp. Auth., 796 F.3d 323, 327 (3d Cir. 2015).

There is no dispute that Hampshire is a member of a

protected class as a female, that she was qualified for the

position of patrol officer, and that her termination constituted

---

6.  We construe Title VII and the PHRA consistently.  See, e.g.,
Scheidemantle v. Slippery Rock Univ., 470 F.3d 535, 539 n.5
(3d Cir. 2006); Atkinson v. LaFayette College, 460 F.3d 447, 454
n.6 (3d Cir. 2006).

an adverse employment action.  Thus, we will focus our inquiry on the fourth prong of the prima facie case, that is, whether Hampshire's termination occurred under circumstances that could give rise to an inference of intentional discrimination on the basis of gender.

After reviewing the record, we conclude that Hampshire has produced no evidence that her termination occurred under circumstances that could give rise to an inference of gender discrimination.  Plaintiffs Hampshire and Jablonski are members of opposite sexes and were treated in an identical manner. After engaging in a vehicle pursuit together on March 9, 2016, they were both suspended, then put on restricted duty, suspended again with a recommendation for discharge, and finally terminated.  This scenario undermines any claim of discrimination on the basis of gender.  See Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 359-60 (3d Cir. 1999). Moreover, Hampshire herself admitted in her deposition that she does not believe that PHA terminated her on the basis of gender or sex.

Accordingly, the court will grant the motion of defendants for summary judgment as to Hampshire's claims for gender discrimination under Title VII and the PHRA in Counts I, II, and VI of the complaint.

IV

We turn next to plaintiffs' claims of discrimination on the basis of race in violation of Title VII and the PHRA in Counts I, II, and VI of the complaint.  Specifically, plaintiffs claim that they were disciplined and terminated because of their race as Caucasians and that African American PHA officers received more favorable treatment.

To defeat summary judgment on their claims for race discrimination, plaintiffs must satisfy the three-step burden-shifting inquiry laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).  Plaintiffs must first produce evidence of the following to make out their prima facie case:  (1) they are a members of a protected class; (2) they were qualified for the position of patrol officer; (3) they suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.  See Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008) (citing McDonnell Douglas, 411 U.S. at 802).

If plaintiffs succeed in making out a prima facie case, the burden of production then shifts to defendants to come forward with a legitimate, nondiscriminatory reason for plaintiffs' termination.  See Makky, 541 F.3d at 214; Scheidemantle v. Slippery Rock Univ., 470 F.3d 535, 539 (3d Cir. 2006).  If defendants are able to provide such a reason, the

-16-

burden of production shifts back to plaintiffs to produce
evidence that the proffered reason is merely a pretext for
actual discrimination.  Makky, 541 F.3d at 214.  Plaintiffs thus
must point to evidence from which this court "could reasonably
either (1) disbelieve [defendants'] articulated legitimate
reasons; or (2) believe that an invidious discriminatory reason
was more likely than not a motivating or determinative cause of
[defendants'] action."  Fuentes v. Perskie, 32 F.3d 759, 764
(3d Cir. 1994) (citing St. Mary's Honor Center v. Hicks, 509
U.S. 502, 510-11 (1993)).  At all times the ultimate burden of
persuasion rests with plaintiffs.  See Fuentes, 32 F.3d at 763
(citing Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. at
253, 254, 256 (1981)).

        As with Hampshire's claim of gender discrimination,
there is no dispute that plaintiffs are members of a protected
class as Caucasians, that they were qualified for their
positions as officers, and that their suspensions and eventual
terminations constituted adverse action.[7]  Thus, the dispute
centers on whether the adverse actions occurred under

---

7.  Claims under Title VII "are not limited to discrimination
against members of any particular race [and Title VII]
proscribe[s] racial discrimination in private employment against
[W]hites on the same terms as racial discrimination against
nonwhites."  Iadimarco v. Runyon, 190 F.3d 151, 158 (3d Cir.
1999) (quoting McDonald v. Santa Fe Trail Transp. Co., 427 U.S.
273, 278-79 (1976)).

circumstances that could give rise to an inference of discrimination.

In support of their claims, plaintiffs assert that there is "ample evidence" of a pattern of racial discrimination at PHA based on prior newspaper articles and lawsuits. In support, they point to a newspaper article entitled "White's Cloud" dated May 29, 1997 that ran in the Philadelphia City Paper, an alternative weekly newspaper which ceased publication in 2015. The article details allegations of racial discrimination and sexual harassment, cronyism, corruption, mismanagement, and various other misdeeds at PHA under John F. White, Jr., the former executive director of PHA. This article is over twenty years old. Plaintiffs do not connect any of the decision-makers involved here to any of the hearsay allegations made in the article. Indeed, Bard and Strauss were not employed at PHA during the timeframe covered by the article. Accordingly, in addition to being inadmissible hearsay, the article is irrelevant and cannot be used as evidence in plaintiffs' case.

Plaintiffs cite to another action brought by plaintiffs' counsel against PHA, Eskridge v. Philadelphia Housing Authority. No. 15-5576 (E.D. Pa. Oct. 13, 2015). In Eskridge, the plaintiff was an African American male who asserted discrimination. Here, plaintiffs are Caucasians who

assert that PHA systematically discriminates against Caucasian
officers in favor of African American officers.  Specifically,
plaintiffs assert that PHA "use[s] the disciplinary process to
thin out the whites so that African American[s] can be hired in
the white's [sic] position."  In Eskridge, the district court
granted summary judgment in favor of defendants on all counts
and that ruling was affirmed by our Court of Appeals.  See
Eskridge v. Phila. Hous. Auth., 722 F. App'x 296, 301 (3d Cir.
2018).  We do not find Eskridge relevant to the claims presented
here.

        Plaintiffs also allege in support of their racial
discrimination claims that defendant Bard made a comment about
"needing more color [at PHA]" around the time of his hire in
February 2015.  Plaintiffs offer the affidavit of John Morozin,
a non-party and former employee of PHA.  Morozin does not claim
to have heard Bard make the statement but rather states that PHA
officer T.J. Camadula told him that he, Camadula, had heard Bard
make the statement.

        Under Rule 56(c)(4) of the Federal Rules of Civil
Procedure, an affidavit used to oppose a motion for summary
judgment "must be made on personal knowledge, set out facts that
would be admissible in evidence, and show that the affiant or
declarant is competent to testify on the matters stated."
Hearsay statements that would be inadmissible at trial may not

-19-

be considered for purposes of deciding a motion for summary judgment. Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009). Bard's statement about "needing more color" would be a party-opponent admission which is not hearsay under the Federal Rules of Evidence. See Fed. R. Evid. 801(d)(2). However, Morozin's "whisper down the lane" declaration regarding what Camadula told him about Bard's statement is hearsay that would be inadmissible at trial. See Smith, 589 F.3d at 693-94. Morozin did not hear Bard make the comment and thus does not have any personal knowledge, but instead is relying on Camadula's statement for the truth of the matter asserted. Plaintiffs have not produced any affidavit from Camadula or other evidence to suggest that Camadula himself would testify at any trial in this matter regarding Bard's statement. Accordingly, the affidavit of Morozin regarding Bard's comment is inadmissible hearsay that cannot be considered to defeat defendants' motion for summary judgment.

Plaintiffs also point to several individuals whom they allege to be comparators to plaintiffs and who were allegedly treated more favorably than plaintiffs. An inference of discrimination may be drawn from evidence that a similarly situated employee outside the protected class was treated more favorably. Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998). "While 'similarly-situated' does not necessarily mean

identically situated, the plaintiff must nevertheless be similar in 'all relevant respects.'" Collins v. Kimberly-Clark Pa., LLC, 247 F. Supp. 3d 571, 589 (E.D. Pa. 2017)(quoting Opsatnik v. Norfolk S. Corp., 335 F. App'x 220, 222-23 (3d Cir. 2009)). Demonstrating that employees are similarly-situated often includes a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Id. at 589-90 (quoting Opsatnik, 335 F. App'x at 223). Plaintiffs here rely on individuals who were not similarly situated and/or did not receive more favorable treatment and thus cannot be deemed comparators.

Plaintiffs have referenced PHA officer Corneisha Hamilton, an African American woman who shot her boyfriend with her PHA weapon and attempted to cover up the shooting. This conduct was not similar to plaintiffs and the record shows in any event that Hamilton was, in fact, terminated. Plaintiffs have also asserted that an African American female PHA officer with the surname Bailey exhausted her sick leave but was not disciplined or terminated. This again is not conduct similar to plaintiffs.

Furthermore, plaintiffs point to Jeffrey Jeannot, an African American male PHA officer who failed to patrol his area

-21-

of responsibility and falsified his patrol log on April 14, 2017. However, Jeannot was terminated in June 2017 and thus did not receive more favorable treatment than plaintiffs.

Plaintiffs argue as another comparator their former supervisor, Abdul Evans, an African American male who, plaintiffs claim, was involved in the pursuit in issue but was not disciplined. However, there is no evidence that Evan was involved in the vehicle pursuit.[8] Moreover, Evans was demoted from sergeant to patrol officer for his failure to supervise plaintiffs adequately and for failure to conduct an investigation of plaintiffs' pursuit. Accordingly, Evans is not an appropriate comparator to plaintiffs.

Plaintiffs also refer to A'Tia Brooks, an African American female PHA officer. PHA records show that, on August 16, 2016, Brooks spotted a white Ford Explorer driving

---

8. Evans is now deceased and was not deposed in this action. In an attempt to manufacture a dispute of fact, plaintiffs have cited the statements of two witnesses who claim to have seen an SUV involved in the pursuit. Plaintiffs assert that the only PHA SUV being operated on the night at issue was assigned to Evans and thus reason that he was involved in the pursuit. However, neither witness definitively identified the SUV as belonging to PHA. Instead, one witness believed he saw a PPD or PHA SUV but did not have his glasses on and could not identify the SUV from photos. Another witness saw a Temple University Police Department SUV. GPS data and PHA patrol logs show that Evans was approximately thirty minutes away on the 6500 block of Lawton Avenue at the time of the pursuit. Accordingly, there is no genuine dispute of material fact as to Evans' location at the time of the pursuit.

recklessly on Fairmount Avenue between 47th and 48th Streets in Philadelphia. Brooks then

> activated her emergency lights and attempted
> to stop the vehicle. <u>Seconds later</u>, the
> Explorer drove into the intersection and hit
> another vehicle. Upon the Explorer coming
> to a stop at 48th and Brown St. the two male
> occupants exited the vehicle and ran away
> from the scene, with Officer Brooks in foot
> pursuit.

(emphasis added). Brooks attempted to stop a vehicle but followed it for mere seconds and less than one city block. This is not comparable to plaintiffs, who pursued a vehicle at a high rate of speed for approximately eleven city blocks, ending in the explosion of the pursued vehicle and the death of the driver. The evidence also shows that Brooks completed a pursuit memorandum about the event and did not falsify her patrol logs or otherwise attempt to cover up the incident as plaintiffs here did.[9]

Finally, plaintiffs focus on another vehicular pursuit involving two African American PHA officers, Moises Jerome and Shania Baylis. Jerome and Baylis engaged in a vehicle pursuit on July 13, 2017. Jerome was suspended with a recommendation for discharge and ultimately terminated from PHA for this

_____

9. Plaintiffs also assert that Brooks failed a psychological examination and was permitted to retake it. This alleged incident is not similar to plaintiffs' conduct and thus is irrelevant.

conduct in October 2018.  Baylis resigned from PHA in December

17, 2017 and thus could not be terminated.  Plaintiffs cite the

lag in time between the Jerome/Baylis pursuit and Jerome's

termination to assert that Jerome was terminated only because he

offered to provide testimony on behalf of plaintiffs in this

lawsuit.  However, the undisputed evidence shows that neither

Jerome nor Baylis prepared a pursuit memorandum as required

under PHAPD Directive O-11.  As a result, Bard was not aware

immediately of the pursuit.  Instead, the investigation of that

pursuit began after PHA was served with a lawsuit brought by a

third party who was injured in an accident caused by the vehicle

pursued by Jerome and Baylis.[10]  Regardless, Jerome was

terminated and thus did not receive more favorable treatment

than plaintiffs.

Even assuming that plaintiffs have satisfied their

prima facie case, defendants have pointed to a legitimate,

nondiscriminatory reason for plaintiffs' terminations.  No

reasonable factfinder could conclude that plaintiffs did not

violate numerous PHA policies, most importantly the policy

against engaging in vehicular pursuits.[11]  Plaintiffs engaged in

10.  Bard left PHA in August 2017 and thus was not involved in
the investigation or Jerome's termination.

11.  Plaintiffs have asserted that PHA Directive O-11 regarding
pursuits was not in effect at the time of the pursuit at issue
here.  On October 23, 2015, PHA issued Directive 45 regarding
safe operation of vehicles.  That directive does not mention

serious misconduct that endangered both their own lives and the
lives of potential third parties who live in Philadelphia.  The
driver of the pursued vehicle died when his vehicle hit a
building and exploded.  There is no genuine dispute that
plaintiffs engaged in the pursuit and that such conduct was in
violation of PHA policy.  Plaintiffs' attempt to characterize
the pursuit as merely "an effort to stop" the speeding vehicle
flies in the face of plaintiffs' own statements regarding the
incident and Pennsylvania law, which defines motor vehicle
pursuits.  See 75 Pa. Cons. Stat. Ann. § 6341.  Plaintiffs have
failed to produce any evidence to create a genuine dispute of
material fact regarding whether the reasons offered by PHA for
their terminations were pretextual.

        Accordingly, we will grant defendants' motion for
summary judgment on plaintiffs' claims for discrimination in
their suspensions and terminations on the basis of race in
Counts I, II, and VI of the complaint.

---

vehicle pursuits except for the following in Section V.A.14:
"Vehicle pursuits are possibly the most dangerous of all police
activities.  Refer to Directive # 41, 'Vehicular Pursuits' for
the policy regarding police vehicle pursuits."  Directive 41 was
intended to be implemented together with Directive 45, but due
to an administrative delay was not issued until June 8, 2016.
Despite this error, there is no evidence that during this time
Directive O-11 was rescinded to the extent is dealt with
pursuits.  Instead, Directive O-11 remained in effect regarding
vehicle pursuits.  In fact, Directive 41 when implemented stated
"This Does Not Replace Any Existing PHAPD Directive."
Plaintiffs further admit that they never received any notice
that Directive O-11 had been rescinded.

We turn next to plaintiffs' claims that they were subjected to a hostile work environment on the basis of race and/or gender in violation of Title VII and the PHRA in Counts I, II, and VI of the complaint.  To defeat summary judgment on their claims of hostile work environment, plaintiffs must come forward with evidence that:  (1) plaintiffs suffered intentional discrimination because of their race and/or gender; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiffs; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of respondeat superior liability.  Castleberry v. STI Grp., 863 F.3d 259, 263 (3d Cir. 2017) (citing Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013)).

Plaintiffs have not met their burden to establish a prima facie case of hostile work environment because they have not produced evidence to support the second element, that is, that they suffered discrimination that was severe or pervasive. To show severe or pervasive discrimination, plaintiffs must produce evidence that the environment at PHA was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment."

<u>Culler v. Sec'y of U.S. Veterans Affairs</u>, 507 F. App'x 246, 249

(3d Cir. 2012) (quoting <u>Nat'l R.R. Passenger Corp. v. Morgan</u>,

536 U.S. 101, 116 (2002)).

The only evidence that plaintiffs identify to support

their hostile work environment claim is that both plaintiffs

were placed on restricted duty during the OAC investigation

during which time they worked at a desk, performed no patrol

duties, and had their guns reclaimed.  Specifically, Jablonski

recalls while on restricted duty "having to sit there and

literally me saying hi to any one of them and them just

completely giving me the cold shoulder."  Plaintiffs' evidence

is insufficient to create a genuine dispute of material fact and

thus we will grant defendants' summary judgment motion with

respect to plaintiffs' hostile work environment claim.[12]

VI

In Count III of the complaint, plaintiffs contend that

defendants deprived them of their rights under the Fourteenth

Amendment to the United States Constitution to procedural due

process in violation of 42 U.S.C. §§ 1981 and 1983.  The

Fourteenth Amendment provides in relevant part:

---

12.  To the extent plaintiffs rely on their suspensions and
terminations as evidence of hostile work environment, they
conflate such claim with their disparate treatment
discrimination claims under Title VII and the PHRA, which fail
for the reasons discussed above.  <u>See</u> <u>Abramson v. William
Paterson Coll. of N.J.</u>, 260 F.3d 265, 281 n.11 (3d Cir. 2001).

> No State shall make or enforce any law which
> shall abridge the privileges or immunities
> of citizens of the United States; nor shall
> any State deprive any person of life,
> liberty, or property, without due process of
> law; nor deny to any person within its
> jurisdiction the equal protection of the
> laws.

U.S. Const. amend. XIV.  To state a claim for deprivation of

procedural due process, a plaintiff must allege that:  "(1) he

was deprived of an individual interest that is encompassed

within the Fourteenth Amendment's protection of 'life, liberty,

or property'[;] and (2) the procedures available to him did not

provide 'due process of law.'"  Hill v. Borough of Kutztown, 455

F.3d 225, 234 (3d Cir. 2006) (citing Alvin v. Suzuki, 227 F.3d

107, 116 (3d Cir. 2000)).  Here, there is no dispute that

plaintiffs were public employees with a property interest in

their employment.

    "An essential principle of due process is that a

deprivation of life, liberty, or property 'be preceded by notice

and opportunity for hearing appropriate to the nature of the

case.'"  Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 542

(1985) (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339

U.S. 306, 313 (1950)).  The Supreme Court has instructed that

due process requires a "pretermination opportunity to respond,

coupled with post-termination administrative procedures."  Id.

at 547-48. The pretermination hearing "need not be elaborate."
Id. at 545. Instead,

> [t]he tenured public employee is entitled to
> oral or written notice of the charges
> against him, an explanation of the
> employer's evidence, and an opportunity to
> present his side of the story. To require
> more than this prior to termination would
> intrude to an unwarranted extent on the
> government's interest in quickly removing an
> unsatisfactory employee.

Id. at 546 (internal citations omitted).

The undisputed evidence presented here shows that, on March 10, 2016, plaintiffs each met with PHA Police Chief Bard, Vice President of Human Resources Strauss, Chief Inspector Marker, and their union representative. During the meeting each plaintiff was presented with a written notice of suspension with the recommendation for discharge. The notice cited the specific policies that plaintiffs were alleged to have violated, including their failure to comply with Bard's order regarding PHAPD jurisdiction, their failure to operate vehicles safely, and making a false statement in an investigation. Attached to the notice was a detailed written explanation of the factual basis for the discipline, which stated that plaintiffs "were involved in a fatal high-speed vehicle pursuit" using their patrol car. The notice was read to plaintiffs, and plaintiffs were asked if they had any questions. Plaintiffs chose to remain silent.

Plaintiffs have presented affidavits asserting that they never received these notices and that they did not know the factual basis for their suspensions. These assertions fly in the face of the clear record evidence, including both plaintiffs' prior admissions in sworn deposition testimony that they received the notices. Plaintiffs have provided no explanation for the discrepancies between their prior testimony and the affidavits. Accordingly, we will disregard these self-serving and contradictory affidavits. See Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir. 1991); Martin v. Merrell Dow Pharm., Inc., 851 F.2d 703, 706 (3d Cir. 1988). The assertion that plaintiffs did not know the basis for their suspensions is particularly shocking given the fact that they were personally served with the notices in a meeting on March 10, 2016, the very morning that the fatal pursuit occurred and after they had already been questioned by PPD AID regarding the incident.

On March 14, 2016, plaintiffs received a revocation of suspension notice stating that they would be placed on restricted desk duty "pending the results of an investigation concerning your involvement in a fatal high-speed vehicle pursuit that occurred on the morning of March [10], 2016." These notices were hand-delivered to plaintiffs' residences. Plaintiffs did in fact return to work on restricted desk duty,

so that there can be no dispute that they received these March 14th notices.

Meanwhile, the PHA OAC conducted a thorough investigation of the alleged vehicle pursuit. During the investigation, OAC reviewed GPS data for all PHA patrol vehicles on the night of the incident, including plaintiffs. OAC also interviewed plaintiffs' supervisor and several individuals who had witnessed the pursuit and/or crash. On March 18, 2016, investigators Joseph Melso and Joseph Serrano attempted to interview Hampshire and Jablonski separately. Both appeared with their union representative. Both plaintiffs were informed they were the subject of an internal, not criminal, investigation. Both refused, on advice of counsel, to give a statement.

Upon completion of the OAC investigation, Bard and Strauss made the determination to suspend plaintiffs for ten days with the recommendation for discharge. On June 6, 2016, plaintiffs were personally served with notices of this decision in a meeting with Bard, Strauss, Marker, and their union representative.

The next day, the union filed a grievance regarding plaintiffs' suspensions. A grievance hearing was held in July 2016. Although plaintiffs did not attend the hearing, there is no evidence that PHA prevented plaintiffs from attending, and

the record demonstrates that multiple representatives of plaintiffs' union were present. After reviewing the evidence, the grievance officer upheld PHA's decision to discipline plaintiffs. Plaintiffs' terminations did not become effective until after the grievance procedure was completed.

Thereafter, at the request of the union, an arbitration hearing was held on March 9, 2017. Both plaintiffs attended and testified at the arbitration. After hearing the evidence, the arbitrator concluded that plaintiffs' dismissals were for just cause.

The undisputed record demonstrates that plaintiffs were provided with written and oral notice of the charges against them and PHA's intent to discipline them. They were also given an opportunity to respond, which they declined. The fact that plaintiffs chose not to speak or ask questions at certain junctures of this process does not mean that they were deprived of the opportunity to respond. See Gniotek v. City of Phila., 808 F.2d 241, 245 (3d Cir. 1986).

The relevant collective bargaining agreement between the parties provides that an employee shall be provided with written notice of intended discipline, including the offense alleged, the type and duration of the discipline, and the intended effective date of the discipline. In situations where the intended discipline is discharge, the employee shall receive

a ten-day suspension with notice of the intent to discharge.
The employee has an opportunity to file a grievance and have a
hearing.  The discharge does not become effective until the
grievance procedure is complete or the parties otherwise resolve
the matter.  As outlined above, there can be no dispute that
defendants followed the disciplinary process outlined in this
agreement.  Where an adequate grievance and/or arbitration
procedure is in place and is followed, a plaintiff has received
the due process to which he or she is entitled under the
Fourteenth Amendment.  See Dykes v. Se. Pa. Transp. Auth.,
68 F.3d 1564, 1565, 1581-72 (3d Cir. 1995); Jackson v. Temple
Univ., 721 F.2d 931, 933 (3d Cir. 1983).

        Plaintiffs further assert that their due process
rights were violated because PHA did not produce to them or
their union a full copy of the OAC report until the morning of
the grievance hearing.  To satisfy due process, PHA was required
only to apprise plaintiffs of "the substance of [the] relevant
supporting evidence" against them.  See Copeland v. Phila.
Police Dep't, 840 F.2d 1139, 1145 (3d Cir. 1988) (quoting Brock
v. Roadway Express, Inc., 481 U.S. 252, 265 (1987)).  While it
may have been preferable for PHA to produce the full OAC report
to plaintiffs and the union earlier than the morning of the
hearing, the record shows that plaintiffs had ample notice of

the charges against them and the substance of the evidence
reviewed by OAC.

Plaintiffs also contend that their due process rights
were violated as outlined under Garrity v. State of New Jersey,
385 U.S. 493, 497-98 (1967).  In Garrity, police officers were
questioned during a state investigation and were told that they
would be removed from their positions if they refused to answer.
385 U.S. at 494-95.  The officers cooperated with the
investigation, and their answers were used against them in a
subsequent criminal prosecution and conviction.  Id. at 495.
The Supreme Court held that their answers to the questions posed
during the investigation had been compelled in violation of
their right against self-incrimination under the United States
Constitution.  Id. at 497-98.

Plaintiffs' claim that their due process rights were
violated because they did not receive warnings as required under
Garrity fails.  Plaintiffs refused to speak with PHA
investigators on advice of counsel and thus were not compelled
to speak.  Moreover, plaintiffs were told from the beginning
that there would be no criminal charges brought against them.
Thus, Garrity is inapposite.

Based on the record before the court, there can be no
dispute that plaintiffs received sufficient due process under

<u>Loudermill</u>.  Accordingly, we will grant defendants' motion for summary judgment as to Count III of the complaint.[13]

VII

In Count IV of the complaint, plaintiffs allege that defendants deprived them "of their fair hearing process rights, equal protection rights and retaliate for their association in union activity."  In support of this claim, plaintiffs have stated in their affidavits that Bard told the union president that the requirement that PHA officers reside within the City of Philadelphia would only change if the union withdrew all arbitrations, including plaintiffs' arbitrations.  Neither plaintiff heard this comment and plaintiffs have not produced any witness to the comment.

The First Amendment of the Constitution provides: "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  Public employees such as plaintiffs here are entitled to exercise their rights under the First Amendment of the United States Constitution without fear of retaliation by their employer.  <u>Brennan v. Norton</u>, 350 F.3d 399, 412 (3d Cir. 2003).  To defeat summary judgment on this claim, plaintiffs must come forward with evidence that:

_____

13.  To the extent that plaintiffs assert any violation of their substantive due process or equal protection rights on the basis of race and/or gender, those claims fail for the reasons discussed in Sections III-V above.

(1) their conduct was protected under the First Amendment;
(2) PHA engaged in a retaliatory action against them; and (3) a
causal connection exists between the protected conduct and the
retaliatory action.  Thomas v. Independence Twp., 463 F.3d 285,
296 (3d Cir. 2006).

It is well-established that "a public employee
possesses a First Amendment right to associate with a union."
Palardy v. Twp. of Millburn, 906 F.3d 76, 84 (3d Cir. 2018)
(citing Smith v. Ark. State Highway Emp., 441 U.S. 463, 465
(1979)).  Plaintiffs' association with their union and use of
the grievance and arbitration procedure is activity protected
under the First Amendment.  However, plaintiffs have failed to
show that PHA engaged in a retaliatory action against them
because of their union membership or activities.

Plaintiffs' suspensions with the recommendation for
discharge and eventual terminations were due to plaintiffs'
failure to follow multiple PHA policies.  Plaintiffs have
produced no evidence that their suspensions and terminations
were causally connected to their union association.  The alleged
ultimatum regarding residency itself is not an adverse
employment action.  The PHA residency requirement was in place
both before and after plaintiffs' terminations.  Plaintiffs did
not withdraw their arbitration requests, and they have not
called the court's attention to anything in the record to show

that the residency requirement adversely affected them.  Simply

put, plaintiffs' First Amendment claim is without merit.

Accordingly, the motion of defendants for summary

judgment on plaintiffs' claim in Count IV of the complaint will

be granted.[14]

---

14.  We note in conclusion that plaintiffs' brief and other
moving papers were riddled with grammatical and typographical
errors.  Many portions of their papers lacked citation to the
record or legal authority.  Where plaintiffs did cite to the
record, the citations were often incorrect or plaintiffs'
assertions misrepresented what the record evidence stated.  See
Eskridge, 722 F. App'x at 299.